# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEW MEXICO

In re:  WESTERN WOOD PRODUCTS, INC.,                    No. 11-12-10057 JS
        A Wyoming profit corporation,

        Debtor.

---

WESTERN WOOD PRODUCTS, INC.,
A Wyoming profit corporation,

        Plaintiff,

v.                                                      Adversary No. 12-1172 J

WESTERN PELLET PRODUCTS, LLC,

        Defendant.

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court following a two-day trial on the merits held February
28 and March 1, 2013.  For purposes of trial the Court consolidated this adversary proceeding
with the Debtor's Motion to Reject Contract and Unexpired Lease with Western Pellet Products,
LLC (the "Motion to Reject").[1]  William F. Davis appeared at trial on behalf of Western Wood
Products, Inc. ("Western Wood").  William R. Keleher and Spencer L. Edelman appeared at trial
on behalf of Western Pellet Products, LLC ("Pellet Products").

Western Wood and Pellet Products are parties to: 1) a supply agreement for the sale by
Western Wood to Pellet Products of wood by-product material produced by Western Wood in
the operation of its sawmill; and 2) a lease of real property by Western Wood to Pellet Products
on land adjacent to the sawmill.  Western Wood contends that Pellet Products has defaulted
under the supply agreement and the lease, and is in breach of the supply agreement and lease.
Western Wood seeks to reject both the supply agreement and the lease in connection with its

---

[1]The Motion to Reject is filed as Docket No. 34 in Case No. 11-12-10057.  The order consolidating the Motion to
Reject with the trial in this adversary proceeding is filed as Docket No. 108 in Case No. 11-12-10057.

Chapter 11 bankruptcy case.[2] Pellet Products denies that it failed to perform under the supply agreement, denies that it is in violation of the lease, and asserts that Western Wood breached the supply agreement. Pellet Products intends to exercise its rights under 11 U.S.C. § 365(h)(1)(A)(ii) and remain in possession of the real property for the remainder of the term under the lease.

After consideration of the evidence presented at trial, and being otherwise sufficiently informed, the Court finds that 1) Pellet Products is not in default under the terms of the supply agreement or the lease and has not breached the supply agreement or lease; 2) Western Wood breached the supply agreement; and 3) Pellet Products is entitled to damages in the event Western Wood rejects the supply agreement and lease. Because the Motion to Reject was premised on Western Wood's belief that Pellet Products was in breach of the supply agreement and in default under the lease, the Court cannot now make a determination as to whether Western Wood properly exercised its business judgment in seeking to reject the supply agreement and the lease. The Court will set a further evidentiary hearing on the Motion to Reject if Western Wood still wishes to reject the supply agreement and lease.

BACKGROUND AND FACTS

Western Wood owns and operates a sawmill near Raton, New Mexico. It has approximately fifty employees. Ray Levengood is the president of Western Wood, and has been since its inception about twenty years ago. Western Wood started construction of its New Mexico sawmill operation in 2003. It began operating in 2004. It obtains most of its timber

---

[2] Western Wood also raised the following matters: 1) which fixtures built by Pellet Products are part of the real estate; and 2) whether Pellet Products violated the automatic stay under 11 U.S.C. § 362(a)(3) by continuing to remove wood by-product material post-petition. *See* Pre-Trial Order, pp. 6-7 (Docket No. 24). The complaint filed in this adversary proceeding included a request for permanent injunction. *See* Complaint for Breach of Contract, Violation of the Automatic Stay, and for Permanent Injunction (Docket No. 1). At trial, counsel for Western Wood stated that Western Wood no longer seeks injunctive relief.

from Vermejo Park Ranch LLC. From the timber, Western Wood manufactures fence posts and poles. Western Wood generates wood by-product material, consisting of wood chips and sawdust, from the operation of the sawmill. Initially, Western Wood sold its wood by-product material wherever it could, but as production increased, Western Wood needed to secure a year-round cash flow and steady market for its wood by-product material. Western Wood produces approximately 40 tons per day of wood by-product material. Western Wood has an air quality exemption from the State of New Mexico for the operation of its sawmill.[3]

Sometime before 2007, Pellet Products was formed for the purpose of starting a wood pellet manufacturing operation adjacent to Western Wood's sawmill. Pellet Products contemplated using the wood by-product material from Western Wood to manufacture wood burning stove pellets. Roger Terry formed Pellet Products. He solicited and obtained $800,000 from investors to start up Pellet Products' business. Roy Pillmore and Mr. Levengood were among the original investors. However, Mr. Levengood did not contribute any money for the formation of Pellet Products or in exchange for his equity interest. Instead, he funded his investment with by-product material supplied by Western Wood either at no charge or at a reduced charge. For the first two years of its existence, Mr. Levengood was a member of the board of Pellet Products. He left the board of Pellet Products in 2009.

Western Wood and Pellet Products entered into a Long Term Lease Agreement (the "Lease") on March 31, 2007. *See* Exhibit 2 and Exhibit C. Under the Lease, Western Wood leased to Pellet Products a 2.56 acre parcel of land located next to the sawmill. The Lease is a ninety-nine (99) year lease beginning March 1, 2007 and ending December 31, 2106, with an annual rental amount of $100, payable on February 1st of each year. *Id.* The Lease also includes

---

[3]Pellet Products does not have an air quality permit, and it is not clear from the evidence whether Pellet Products is covered by Western Wood's exemption.

the following terms: 1) Pellet Products is responsible for payment of "all utilities on the premises . . . including . . . gas, water, electricity, heat, garbage and sewer collection"; 2) Pellet Products will build a factory and facilities on the leased premises for the purpose of manufacturing wood pellet products and other related wood products and services; 3) "[a]ll fixtures built by [Pellet Products] except the buildings, shall not merge with the real estate, but shall remain the property of [Pellet Products]"; 4) Pellet Products will "not use the premises during the term hereof for any purposes contrary to the laws of the State of New Mexico or the United States"; 5) if the Lease is terminated, Pellet Products has six months within which to remove the fixtures; and 6) Pellet Products must maintain a liability insurance policy and a $1,000,000 policy insuring the plant and the property, listing Western Wood as an additional insured to be kept in full force and effect during the Lease term. *Id.* The Lease also requires Pellet Products to perform all of its obligations under the supply agreements described below. *See* Exhibit 2. Ray Levengood signed the Lease on behalf of Western Wood, and Roger Terry signed the Lease on behalf of Pellet Products. *Id.* Mr. Levengood does not remember when or if Pellet Products paid rent in 2008, 2009, or 2010 because his primary focus at that time was to get the plant running. He does recall that Pellet Products delivered a check to Western Wood for the 2012 rent, and that the 2013 rent was paid by check sent by registered mail.

On March 22, 2007, Western Wood and Pellet Products entered into a supply agreement (the "First Supply Agreement"). Mr. Levengood signed the First Supply Agreement on behalf of Western Wood, and Roger Terry signed the First Supply Agreement on behalf of Pellet Products. *See* Exhibit 1 and Exhibit B. The First Supply Agreement is a one-page document that contains the following provisions:

> Western Wood Products Inc. (the Supplier) will supply Western Pellet Products LLC (the Producer) all of the waste products that are chips or materials available to be chipped as a

result of operations of the Supplier. The Supplier may withhold materials to fulfill the current contractual obligation with Zeager Brothers and Silver Dollar shavings.

The Producer will purchase the materials as listed in paragraph one at the rate of thirty dollars per dry ton ($30.00) for the first five years.

The Producer will receive all of its supply for the production of wood pellets from the Supplier. In the event the Producer is unable to obtain an adequate volume of waste material from the Supplier then the Producer may request the Supplier to obtain additional materials at a price and volume agreeable in writing by both parties. Any variation of this agreement will require written authorization from both parties.

First Supply Agreement, ¶¶ 1, 2, and 4.

The First Supply Agreement provided that Western Wood would provide the first 12,000 tons of wood by-product material to Pellet Products "in lieu of cash for 360,000 shares of stock" in Pellet Products. First Supply Agreement, ¶ 3. Under this arrangement, Mr. Levengood would obtain an equity interest in Pellet Products. *Id.* The First Supply Agreement also contemplated that the price for by-product materials could increase by up to 5% after the first five years, and that, if the cost of business dramatically increased due to circumstances beyond the parties' control causing a hardship on either party, the parties would negotiate a new price. *Id.* at ¶ 5. Pellet Products anticipated that during the first five years of operation under the First Supply Agreement Pellet Products would complete its start-up phase and achieve full production. A document used to solicit the initial investment in Pellet Products estimated full production to be within three years. *See* Exhibit A ("As much as 40 tons can be shipped daily when the plant reaches full operation increasing over the next three years to 80 – 100 tons per day.").

Pellet Products began construction of its pellet plant in the spring of 2007. It began production some time in 2008. To create its products, Pellet Products picks up the wood by-product material from Western Wood. The wood by-product material is entered into a feed hopper and gets screened for the purpose of classifying the material into different size particles.

-5-

Some of the material is sent to the grinder to get resized. Then the material goes to the dryer, and the drying bin. Ultimately, the material is run through the pellet mill which creates the pellets through a machine that presses the material and extrudes the finished pellet product. The dryer is fueled by burning Western Wood's sawdust that is part of the by-product material Pellet Products purchases from Western Wood.

The equipment Pellet Products initially purchased was used and was not in great working condition. Pellet Products has one large pellet mill and one small pellet mill. Some components that Pellet Products originally purchased for the mills were improperly sized. Pellet Products had difficulties ramping up production and getting its business profitable. Often Pellet Products was short of cash needed to purchase parts that would break down on its production line, creating a "parts on shelf" problem that inhibited its productivity. Pellet Products did not have sufficient cash on hand to keep replacement products on the shelf, including a custom-made critical part, a die, which could take up to two weeks to receive after it was ordered. The vendor for the die eventually required Pellet Products to pay cash in advance. Pellet Products conducted two recapitalization efforts to obtain additional funds from its investors in an attempt to address this and other problems. Including the initial investment and subsequent recapitalization efforts, Pellet Products raised approximately $2 million.

Sometime after Pellet Products began production, Western Wood and Pellet Products verbally agreed, as a concession to Western Wood, that Pellet Products would pay Western Wood for wood by-product material until the first 12,000 tons of wood by-product material had been supplied at the rate of $15.00 per dry ton plus a reduced equity share in Pellet Products, instead of Western Wood supplying such product without charge in exchange for equity in Pellet Products. This adjustment was made at the request of Western Wood at a time when Western

-6-

Wood and Pellet Products both were experiencing cash flow difficulties. Mr. Pillmore testified that Pellet Products agreed to this change even though it would reduce Pellet Products' cash situation because it had been Pellet Products' belief from the outset that the success of Western Wood was tied to the success of Pellet Products and that the two companies had a "symbiotic" relationship.

Western Wood and Pellet Products re-negotiated the First Supply Agreement in September of 2009, and entered into another supply agreement (the "Second Supply Agreement"). *See* Exhibit 3 and Exhibit F. The one-page Second Supply Agreement consists in its entirety of the following terms:

1. Western Wood Products Inc[.] (the Supplier) will supply Western Pellet Products LLC (The Producer) all of the waste products that are chips or materials available to be chipped as of a result of operations of the Supplier.
   Western Wood Products reserves the right to sell any materials deemed unusable or agreed upon overstock by Western Pellet Products plant manager.

2. The Producer will purchase the materials as listed in paragraph one at a rate of thirty dollars per dry ton ($30.00) for the first three years. $30.00 per dry ton is the rate established for the Bi-Products generated by manufacturing of post and poles material. Any other source of chips or raw material beyond that of the bi-product stream will be negotiated on a case by case bases [sic.] these materials will be paid for on a negotiated schedule.

3. The Producer will receive all of its supply for the production of wood pellets from Supplier. In the event the Producer is unable to obtain an adequate volume of waste material from the Supplier then the Producer may request the Supplier to obtain additional material at a price and volume agreeable in writing by both parties. Not to exceed 10% of suppliers costs considering moisture and fuel. Any variation of this agreement will require a written authorization form both parties.

4. Materials supplied by the Supplier (with the exception of non bi-product materials) may increase in price after the first three years to a level equal to the increased cost of business but not to exceed five percent (5%) per year. In the event the cost of business dramatically increases due to uncontrollable circumstances that create a hardship on the Supplier or the Producer, both parties will agree upon a negotiated price in writing.

5.  This agreement will survive the sale of either business entity unless otherwise agreed upon in writing.

Second Supply Agreement, ¶¶1 – 5.

The three-year period reflected in the Second Supply Agreement is the period of time then remaining under the First Supply Agreement as of the date of the Second Supply Agreement.

Neither Western Wood nor Pellet Products were represented by counsel during the negotiation of the Lease, the First Supply Agreement or the Second Supply Agreement.  No other written agreements between Western Wood and Pellet Products for the sale of wood by-product material by Western Wood to Pellet Products were ever made.

Western Wood had an expectation when it entered into the First Supply Agreement and Second Supply Agreement that after Pellet Products' startup phase and its ramp up of production, Pellet Products would produce some 40 tons of wood by-product material per day for which Western Wood would receive an income stream of approximately $30,000 per month from the sale of wood by-product material to Pellet Products.  Western Wood also had an expectation that Pellet Products would consume *all* of Western Wood's wood by-product material.  Pellet Products never achieved that level of production.  Mr. Levengood testified that from the fall of 2008 through the end of 2011, Pellet Products averaged production and payment to Western Wood of close to $8,000 per month, though the transaction record for invoices and payments suggests a somewhat lower figure.  *See* Exhibit 21 and Exhibit W.  Western Wood also expected that payment for a "dry ton" under the First Supply Agreement and the Second Supply Agreement would be based on a dry ton of Western Wood's wood by-product material consisting of chips and sawdust.  However, Pellet Products paid Western Wood based on a dry ton of finished pellet materials.  The dry ton of finished pellet materials does not include the wood by-product material that Pellet Product used for fuel in drying the by-product material, nor by-

-8-

product material wasted as part of the pellet manufacturing process. Western Wood complained about not being paid for the wood by-product material burned for fuel or wasted in the pellet manufacturing process. The parties tried but never reached an agreement on how to measure the dry ton weight of the burned or wasted by-product material. Mr. Levengood acknowledged that neither party had an adequate measuring system and that it was nearly impossible to track how much by-product material was supplied to Pellet Products that was burned for fuel or wasted in the manufacturing process. Mr. Walton, plant manager for Pellet Products, conducted some studies in an effort to determine the amount of by-product material used to create a dry ton of finished pellets. Based on his studies, he believes that it takes 8.6 yards of wood by-product material to produce one ton of finished pellet products. Throughout the period that the parties conducted business, Pellet Products paid Western Wood based on the weight of its finished product.

Historically, Pellet Products paid Western Wood between sixty and ninety days after Pellet Products inventoried its finished pellet product at the end of each month, based on dry tons of finished product. On occasion Pellet Products' payments were more than ninety days after month-end. Mr. Levengood testified that Pellet Products was to pay Western Wood fifteen days after the end of each calendar month, but he also acknowledged that neither of the supply agreements included any terms regarding when payments were due. Pellet Products would review its production report at the end of each month to determine the amount to pay Western Wood. When Pellet Products first started production, it paid Western Wood based on tons of finished product Pellet Products shipped to its customers. At the request of Mr. Levengood, that arrangement changed so that payment was to be made after finished product was produced.

-9-

Pellet Products was never able to achieve the production levels that would require its use of 40 tons of wood by-product material per day that the parties anticipated when the First Supply Agreement was made. By late 2009 or 2010 it was clear that Pellet Products would not be purchasing all of the wood by-product material that Western Wood produced. Mr. Pillmore testified that he told Mr. Levengood that Western Wood should not hold all the wood by-product material for use by Pellet Products but that the parties never really discussed the possibility of Western Wood actually selling the overstock.

Sometime in 2009, Western Wood learned of a government subsidy program it believed could directly benefit Western Wood and thereby indirectly benefit Pellet Products. To participate in this program Mr. Levengood believed that he could not hold an interest in Pellet Products. He transferred his interest in Pellet Products to his sons. Ultimately, Western Wood decided not to pursue the program, in part because the parties learned that Western Wood would not be the beneficiary of the program.

In addition to heating fuel pellets, Pellet Products has developed different products, including a loss circulation material ("LCM") used for certain applications in the oil and gas industry; horse bedding pellets; and cat litter.[4]

On May 18, 2011, Western Wood sent a letter prepared by its attorney to Pellet Products (the "Letter"). *See* Exhibit 36. The Letter states that Pellet Products is in violation of the Lease based on the following: 1) "failing to re-meter the leased premises for water usage by [Pellet Products], for garbage removal at the expense of [Western Wood] and the non-payment for consumption of water use by [Pellet Products]" and; 2) failure "to keep in effect a liability insurance policy insuring the plant and property for $1,000,000 indicating the landlord as an

---

[4]Although there is a patent issue with labeling and using the product as LCM, the same product can be used for other applications in the oil and gas industry. Pellet Products has worked with the owners of the patent to establish other applications. Pellet Products now markets the LCM-type material it manufactures as pit remediation material.

additional insured and loss payee[.]"  The Letter also complains of "large contaminated waste piles" and other "large piles of product[,]" and demands payment for "product stolen by a previous employee of [Pellet Products] which otherwise could have been sold to other markets." The Letter states that Western Wood has elected to terminate the Lease.  Finally, the Letter demands payment due under the Second Supply Agreement, and "deems the [supply] agreement terminated . .. for failure to utilize all of the supply of material set aside for the production for wood pellets."

Mr. Levengood testified that he had asked Mr. Pillmore for documentation of the insurance policy over the years, but that Pellet Products did not provide him with insurance documentation.  Other than the Letter, Western Wood never sent a written request to Pellet Products regarding insurance.  After Western Wood sent the Letter to Pellet Products, Pellet Products provided Western Wood with a copy of an insurance policy dated Mary 24, 2011 that reflects Western Wood as an additional insured.  *See* Exhibit U.  Mr. Pillmore testified that upon receipt of the Letter, he immediately instructed Pellet Products' manager to contact the insurance agent to make sure that Western Wood was listed as an additional insured on Pellet Products' insurance policy.  He testified that he believed he had previously requested the insurance company to list Western Wood as an additional insured.  Western Wood has not received a notice of cancellation of this policy.  Pellet Products also put a water meter in and stopped using Western Wood's dumpsters.

Before Pellet Products received the Letter, Western Wood had never made Pellet Products aware that there was an issue with untimely lease payments, water usage or trash.  Mr. Pillmore was aware that Western Wood had complained that Pellet Products wrongfully dumped waste material onto a pile of by-product material, but he noted that employees of Western Wood

-11-

also dumped trash or dirt on the same pile. Mr. Pillmore testified further that when Pellet Products hired a new manager, the issue of significant waste of by-product material in connection with Pellet Products' manufacturing process was largely eliminated.

In July of 2011, Western Wood sent a letter to Pellet Products stating that Western Wood "will not be pursuing legal action at this time to break the supply agreement with Western Pellet Products as the issues of concern have been addressed." *See* Exhibit T and Exhibit 37. Western Wood sent this letter in response to e-mail correspondence from Mr. Pillmore that led Mr. Levengood to believe that Pellet Products was trying to obtain additional operating capital from its investors to solve problems that would allow it to ramp of production and pay for larger quantities of by-product material. Mr. Levengood had hoped to renegotiate a price with Pellet Products. That did not occur.

In 2007, Western Wood built a pressure treatment plant for the purposes of adding pressure treated preservative to its fence posts. Western Wood borrowed an additional $2 million from its lender, International Bank, primarily used to build the pressure treatment plant and a front office. After the pressure treatment plant was built, Western Wood borrowed approximately an additional $200,000. Western Wood expected to sell all of its pressure treated fence posts to Forest Products Distributors ("Forest Products") under a long term supply agreement, but that did not occur. Western Wood's dispute with Forest Products over Forest Products' obligation to buy pressure treated fence posts, as well as Pellet Products' inability to ramp up production, greatly contributed to Western Wood's financial difficulties.

Western Wood filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on January 9, 2012. Western Wood owes approximately $5.2 million to its secured lender, International Bank. The monthly debt service on the loan is approximately $35,000. Western

-12-

Wood has had difficulty servicing this debt since 2008. As of the petition date, Pellet Products owed Western Wood approximately $14,000 for wood by-product material obtained from Western Wood under the Second Supply Agreement. A portion of this amount is attributable to pellet production that occurred in February and March of 2011. *See* Exhibit 21. The last payment Western Wood received from Pellet Products before the bankruptcy filing was in December of 2011. *Id.* Post-petition, Pellet Products paid Western Wood approximately $18,000 representing prior receivables due to Western Wood under the Second Supply Agreement. *Id.* Pellet Products cut a check for payment of rent for 2012 on January 31, 2012. *See* Exhibit V.

Recently, Western Wood has negotiated a few contracts for the sale of its by-product material to other parties. Mr. Levengood testified that Western Wood anticipates revenue from the sale of its by-product material to parties other than Western Wood of $25,000 to $50,000 per month. Western Wood's monthly operating report for January 2013 reflects by-product income of $25,678.08. *See* Exhibit WW. Mr. Levengood testified further that he did not seek to secure sales of excess by-product material to other customers during the time that Pellet Products was attempting to ramp up its business because Mr. Levengood believed that Western Wood was obligated under the Second Supply Agreement to provide all of its product to Pellet Products. He believed that potential buyers would be reluctant to enter into a contract if there was a risk that the buyers would lose their source in the event Western Wood had to supply Pellet Products under the Second Supply Agreement. Since the filing of the bankruptcy case, Western Wood's pile of wood by-product material has increased significantly.

Mr. Pillmore testified that sometime near the end of 2011, Pellet Products received an offer to purchase its business as an ongoing pellet manufacturing plant for $4 million. There is no evidence that the offer was accepted. No written offer is in evidence.

Pellet Products had a loan secured by its equipment. Several of Pellet Products' investors were guarantors for the loan. The guarantors paid off the loan secured by Pellet Products' equipment. The estimated current value of Pellet Products' equipment in place is approximately $800,000. If the equipment had to be sold separately and removed from the site, the estimated value of the equipment is $400,000.

Pellet Products estimates that it produced approximately 400 tons per month in 2012. Pellet Products' goal was to produce 800 tons per month but it never reached that goal. Pellet Products remains optimistic that it could eventually reach that goal if the Second Supply Agreement is not rejected. On its most productive days, Pellet Products produced over 50 tons per day. In its first five years of operation, Pellet Products sustained losses of at least $1.8 million. Sometime in March of 2012, the main bearing on Pellet Products' large mill broke down. The cost to replace that part is approximately $6,000 to $7,000.

Also during March of 2012 and continuing into April 2012, representatives of Western Wood would alternately tell representatives of Pellet Product that Pellet Product could or could not take wood by-product material from the piles on Western Wood's sawmill property: one day Pellet Products would be allowed to remove by-product material, and some days later Pellet Products would not be allowed to remove by-product material. This went on for some time, but by mid April 2012, Western Wood permanently cut off supply of the wood by-product material to Pellet Products. Western Wood dug a trench between the sawmill property and the property leased to Pellet Products to prevent Pellet Products from coming on to the sawmill property.

Pellet Products has now ceased operations. Pellet Products timely paid Western Wood the rent under the Lease for 2013.

DISCUSSION

The Bankruptcy Court looks to applicable state law to construe and interpret contracts. *In re Schott,* 282 B.R. 1, 7 (10th Cir. BAP 2002)(citing *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979)). The First Supply Agreement and the Second Supply Agreement were entered into and performed in the state of New Mexico, and neither document contains a choice of law provision. Consequently, New Mexico law applies.[5] The First Supply Agreement and the Second Supply Agreement, which contemplate the sale of wood by-product material by Western Wood to Pellet Products, are contracts primarily for the sale of goods as defined under the Uniform Commercial Code.[6] Thus the interpretation and enforcement of the First Supply Agreement and the Second Supply Agreement are governed by the Uniform Commercial Code as adopted in New Mexico (the "UCC").[7]

Parties may form a contract for the sale of goods under the UCC "in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." N.M.S.A. 1978 § 55-2-204(1)(1993 Repl. Pamp.). "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate

---

[5]*See In re Rottiers,* 449 B.R. 133, 135 (Bankr.D.N.M. 2011)(explaining that, under New Mexico law, when the contract does not contain a choice of law provision, the court applies the "most significant relationship test" described in the Restatement (Second) of Conflict Laws, which includes such factors as the place where the contract was negotiated, the place of performance, and the location of the subject matter of the contract, to determine which state law should be applied).
[6]"Goods" are defined as "all things . . . which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid . . . " N.M.S.A. 1978 § 55-2-105 (1993 Repl. Pamp.).
[7]*See Kirkpatrick v. Introspect Healthcare Corp.,* 114 N.M. 706, 709, 845 P.2d 800, 803 (1992)(a contract primarily for the sale of goods is subject to the UCC); *State ex rel. Concrete Sales & Equip. Rental Co., Inc. v. Kent Nowlin Constr., Inc.,* 106 N.M. 539, 541, 746 P.2d 645, 647 (1987)(finding that purchase order for sale of crushing materials and for the service and manufacture of crushing materials was a sale for goods governed by the UCC).

-15-

remedy." N.M.S.A. 1978 § 55-2-204(3)(1993 Repl. Pamp.).  If there is an ambiguity in the

parties' agreement, the Court may look to extrinsic evidence to discern its meaning.[8]  The UCC

also contains "gap-filling" provisions that can supply certain missing terms in an agreement for

the sale of goods.[9]  Under New Mexico's UCC,

> Terms with respect to which the confirmatory memoranda of the parties agree or
> that are otherwise set forth in a writing intended by the parties as a final
> expression of their agreement with respect to such terms as are included therein
> may not be contradicted by evidence of any prior agreement or of a
> contemporaneous oral agreement but may be explained or supplemented:
>
> (a) by course of performance, course of dealing or usage of trade (Section 55-1-
>     303 NMSA 1978); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to
>     have been intended also as a complete and exclusive statement of the terms of
>     the agreement.
>
> N.M.S.A. 1978 § 55-2-202 (2009 Cum. Supp.).

The parties' written agreement may be explained or supplemented under this section based on

the parties' course of performance, course of dealing, or usage of trade.  *Bowlin's, Inc. v. Ramsey*

*Oil Co., Inc.,* 99 N.M. 660, 671, 662 P.2d 661, 672 (Ct.App. 1983)(citing the applicable sections

of the UCC).  "Course of performance" is defined as:

> a sequence of conduct between the parties to a particular transaction to a
> particular transaction that exists if:

---

[8]*See, Northwest Cent. Pipeline Corp. v. JER P'ship*, 943 F.2d 1219, 1227 (10th Cir. 1991)(applying Colorado law,
and finding that where contract governed by UCC contained incomplete language from which conflicting inferences
could be drawn, the language was ambiguous and the court could admit extrinsic evidence to explain the parties'
intentions). *See also, Mark V, Inc. v. Mellekas,* 114 N.M. 778, 782, 845 P.2d 1232, 1236 (1993)(under New Mexico
common law regarding contract interpretation, "to determine the meaning of the ambiguous terms, the fact finder
may consider extrinsic evidence of the language and  conduct of the parties and the circumstances surrounding the
agreement, as well as oral evidence of the parties' intent.")(citation omitted).  However, under the UCC, finding an
ambiguity in the language of the agreement is not a precondition to the Court's consideration of extrinsic evidence
of the parties' conduct after the formation of the agreement to explain or supplement a term contained in the parties'
agreement. *See Sicor Ltd. v. Cetus Corp.,* 51 F.3d 848, 857 (9th Cir. 1995)(applying California's Commercial Code,
and stating that "a substantial quantum of inconsistency or ambiguity in a contract for the sale of goods is not a
prerequisite to consideration of the parties' subsequent conduct.").

[9]*See, e.g.,* N.M.S.A. 1978 § 55-2-305 (1993 Repl. Pamp.)(price); N.M.S.A. 1978 § 55-2-308 (1993 Repl.
Pamp.)(place for delivery); N.M.S.A. 1978 § 55-2-309 (1993 Repl. Pamp.)(time for shipment or delivery).

-16-

>    (1) the agreement of the parties with respect to the transaction involves
>        repeated occasions for performance by a party; and
>
>    (2) the other party, with knowledge of the nature of the performance and
>        opportunity for objection to it, accepts the performance or acquiesces
>        in it without objection.

N.M.S.A. 1978 § 55-1-303(a) (2009 Cum. Supp.).

"Course of dealing" relates only to conduct between the parties to the agreement that occurred before the parties entered into the agreement. *See* N.M.S.A. 1978 § 55-1-303 (2009 Cum. Supp.)(Comment 2.)("'Course of dealing,' as defined in subsection (b), is restricted, literally, to a sequence of conduct between the parties previous to the agreement.").

"Usage of trade" is defined as:

> any practice or method of dealing having such regularity of observance in a
> place, vocation or trade as to justify an expectation that it will be observed
> with respect to the transaction in question. The existence and scope of such a
> usage must be proved as facts. If it is established that such a usage is
> embodied in a trade code or similar record, the interpretation of the record is a
> question of law.

N.M.S.A. 1978 § 55-1-303(c)(2009 Cum. Supp.).

Wherever reasonably possible, the express terms of the agreement, the parties' course of performance in carrying out the agreement, the parties' past course of performance, and usage of trade should be construed so that they are consistent with each other. N.M.S.A. 1978 § 55-1-303(e)(2009 Cum. Supp.).   If such construction is not possible, the Court must give the express terms of the agreement greater weight than course of performance, course of dealing and usage of trade; course of performance greater weight than course of dealing and usage of trade; and course of dealing greater weight than usage of trade. N.M.S.A. 1978 § 55-1-303(e)(1) – (3)(2009 Cum. Supp.).[10]

---

[10] Section 55-1-303(e) provides:

Evidence of the parties' course of performance "is admissible to construe ambiguous terms in the contract, or to add to terms that are already in the contract, even when such terms would be inconsistent with the written language of the contract." *Guidance Endodontics, LLC v. Dentsply Int'l Inc.,* 2009 WL 3672452, *4 (D.N.M. Oct. 2, 2009)(unreported)(citing 3 R. Duesenberg, H. Gabriel, W. Henning, *Sales & Bulk Transfers Under the UCC* §4.08[b][i](Matthew Bender 2009)).  *See also,* N.M.S.A. 1978 § 55-1-303(d)(2009 Cum. Supp.)("A course of performance . . . is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to the specific terms of the agreement and may supplement or qualify the terms of the agreement."); Henry D. Gabriel & Linda J. Rusch, *The ABCs of the UCC (Revised) Article 2: Sales*, 31 (Amelia H. Boss, ed. 2004)("Contract terms can be implied through the parties' course of performance.").  Course of performance can also be relied upon to demonstrate a waiver or modification of any term in the parties' agreement that is inconsistent with the parties' course of performance.  *See* N.M.S.A. 1978 § 55-1-303(f)(2009 Cum. Supp.)(subject to certain exceptions[11], "a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance.").  Courts may also rely upon the common law to supplement, but not to contradict, provisions contained in the UCC.  *See* N.M.S.A. 1978 § 55-1-103(b)(2009 Cum. Supp.)("Unless displaced by the particular

---

(1) express terms prevail over course of performance, course of dealing and usage of trade;
(2) course of performance prevails over course of dealing and usage of trade; and
(3) course of dealing prevails over usage of trade.

N.M.S.A. 1978 § 55-1-303(e)(1) – (3)(2009  Cum. Supp.).

[11]*See* N.M.S.A. 1978 § 55-2-201 (1993 Repl. Pamp.) (requiring a writing to satisfy the statute of frauds with respect to a contract for the sale of goods); N.M.S.A. 1978 § 55-2-209(3)(1993 Repl. Pamp.)(requiring a modification to a contract for the sale of goods to satisfy the statute of frauds with respect to a contract for the sale of goods); N.M.S.A. 1978 § 55-2A-208 (1993 Repl. Pamp.)(regarding modification, rescission and waiver with respect to leases governed by the UCC).

-18-

Case 12-10057-j11    Doc 143    Filed 04/04/13    Entered 04/04/13 16:42:31 Page 18 of 40

provisions of the Uniform Commercial Code, the principles of law and equity, including . . . the law relative to . . . estoppel . . . supplement its provisions.").[12]

A. *The Second Supply Agreement*

The Second Supply Agreement is a one-page document that contains incomplete and internally inconsistent terms. For example, language in the Second Supply Agreement appears to require both that Western Wood supply to Pellet Products *all* of the wood by-product material resulting from its sawmill operation and that Pellet Products need only purchase the amount of wood by-product material it *needs* to manufacture its products. The Second Supply Agreement further provides that "Western Wood Products reserves the right to sell any materials deemed unusable or agreed upon overstock by Western Pellet Products plant manager." *See* Second Supply Agreement, ¶ 1. Other examples are the Second Supply Agreement's inclusion of a price term, but omission of when payments are to be made; and the inclusion of a pay weight term, but omission of how a dry ton of by-product material supplied by Western Wood is to be measured. Because of these internal inconsistencies and omissions, the Court will look to extrinsic evidence, including the parties' course of performance, in order to ascertain the meaning of the Second Supply Agreement and to imply additional terms that are not inconsistent with the terms in the Second Supply Agreement.[13]

Western Wood asserts that Pellet Products has breached the Second Supply Agreement based on the following: 1) failure to purchase required quantities of wood by-product material; 2) failure to provide Western Wood with satisfactory monthly production reports and accounting;

[12] *Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.,* 137 N.M. 524, 535, 113 P.3d 347, 358 (Ct.App. 2005)(applying the express provisions of the UCC rather than common law principles where the UCC contains a comprehensive section dealing with the matter at issue).

[13] *Cf. Northwest Cent. Pipeline,* 943 F.2d at 1226 (determining that the court properly determined that the contracts were not intended as the complete and exclusive statement of the terms of the agreement, and properly admitted extrinsic evidence to imply a consistent additional term).

3) failure to pay for by-product material in billed and unbilled amounts; 4) failure to timely pay for wood by-product material; 5) failure to weigh the wood by-product material removed from Western Wood's property for use in the pellet mill; and 6) removal of material without permission from Western Wood.   These alleged breaches can be categorized in terms of the following:  required quantity of material to be purchased and sold; payment terms; method of measuring the amount of wood by-product used by Pellet Products for which payment is due (the "Pay-weight Measurement"); and miscellaneous breaches.  The Court will discuss each category separately.

> *Quantity:*      *1) failure to purchase required quantities of wood by-product material; and*
> *2) failure to provide Western Wood with satisfactory monthly production reports and accounting*

The Second Supply Agreement contains the following terms regarding the required quantity of wood by-product material to be supplied and purchased:

> Western Wood Products Inc[.] (the Supplier) will supply Western Pellet Products LLC (the Producer) all of the waste products that are chips or materials available to be chipped as a result of operations of the Suppler.
> Exhibit 3, ¶ 1.
>
> The Producer will purchase the materials as listed in paragraph one  . . . .
> Exhibit 3, ¶ 2.

This is a typical provision in an "output" contract for the sale of goods under which the buyer agrees to purchase all of the seller's good faith output of the specified goods during a certain period at an agreed price in exchange for the seller's promise to sell all of such goods exclusively to the buyer.[14]

The Second Supply Agreement provides further:

---

[14]"In an output contract, the quantity of goods to be delivered under the contract is governed by the seller's good faith output." *Griffith v. Clear Lakes Trout Co., Inc.*, 146 Idaho 613, 621, 200 P.3d 1162, 1170 (Idaho 2009)(citation omitted).

> The Producer will receive all of its supply for the production of wood pellets from the Supplier.
> Exhibit 3, ¶ 4.

This is a typical provision in a "requirements" contract for the sale of goods under which the seller promises to supply all the specified goods the buyer may need during a certain period at an agreed price in exchange for the buyer's promise to obtain all goods it requires exclusively from the seller. [15]

The UCC recognizes both "output" and "requirements" contracts that do not specify the exact quantity of goods to be purchased under an agreement for the sale of goods. *See* N.M.S.A. 1978 § 55-2-306 (1993 Repl. Pamp.)("A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.").

> Paragraph one of the Second Supply Agreement also includes the following provision:
>
> Western Wood Products reserves the right to sell any materials deemed unusable or agreed upon overstock by Western Pellet Products plant manager.
> Exhibit 3, ¶ 1.

These provisions suggest that the Second Supply Agreement is a hybrid between a "requirements" contract and an "output" contract.

---

[15]"A 'requirements' contract is generally defined as a contract in which the seller promises to supply all the specific goods or services which the buyer may need during a certain period at an agreed price in exchange for the promise of the buyer to obtain his required goods or services exclusively from the seller. Although the buyer does not agree to purchase any specific amount, the requisite mutuality and consideration for a valid contract is found in the legal detriment incurred by the buyer in relinquishing his right to purchase from all others except from the seller.*" Propane Indus., Inc. v. General Motors Corp.*, 429 F.Supp. 214, 218 (D.C.Mo. 1977)(citations omitted). *See also BRC Rubber & Plastics, Inc. v. Continental Carbon Co.*, 876 F.Supp.2d 1042, 1050 (N.D.Ind. 2012)("'A requirements contract is one in which the purchaser agrees to buy all of its needs of a specified material exclusively from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract.'")(quoting *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.*, 186 F.3d 815, 817 (7th Cir. 1999)(quoting *Ind.-Am. Water Co. v. Town of Seelyville*, 698 N.E.2d 1255, 1259 (Ind.Ct.App. 1998)(additional internal quotation marks omitted)).

In construing the Second Supply Agreement, each of these terms must be construed together as a whole. *Nearburg v. Yates Petroleum Corp.,* 123 N.M. 526, 536, 943 P.2d 560, 570 (Ct.App. 1997)("In interpreting a contract, the court must consider the contract as a whole and give significance to each part.")(citations omitted).[16]  Here, even though the first sentences in paragraphs 1 and 2 of the Second Supply Agreement indicate that Western Wood must supply all of its wood by-product material to Pellet Products and Pellet Products must buy all the by-product material from Western Wood, the second sentence allows Western Wood to sell "agreed upon overstock" to third parties.  Exhibit 3, ¶ 1.  Paragraph 3 requires Pellet Products to purchase its wood by-product material *only* from Western Wood, but does not specify any minimum quantity that Wood Products must purchase.

Under the UCC, the quantity under an output or requirements contract where no estimated quantity is stated means actual output or requirements as may occur in good faith, "except no quantity unreasonably disproportionate . . .  to any normal or otherwise comparable prior output or requirements may be tendered or demanded."  N.M.S.A. 1978 § 55-2-306(1)(1993 Repl. Pamp.).[17]  Here, no estimated requirements quantity is stated in the Second

---

[16]*See also Krieger v. Wilson Corp.,* 139 N.M. 274, 279, 131 P.3d 661, 666 (Ct.App. 2005)("'A contract must be construed as a harmonious whole, and every word or phrase must be given meaning and significance according to its importance in the context of the whole contract.'")(quoting *Aspen Landscaping, Inc. v. Longford Homes of N.M., Inc.,* 135 N.M 607, 92 P.3d 53 (Ct.App. 2004)(additional internal quotation marks and citation omitted)). *Cf. Kirkpatrick,* 114 N.M. at 711, 845 P.2d at 805 ("When determining whether or not a contract is ambiguous, the court must consider the contract as a whole.")(citation omitted).

[17]*See also Northern Natural Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 608 (Tex. 1998)("Nothing requires the seller in an output contract to have any output, and nothing requires the buyer in a requirements contract to have requirements. On the other hand, parties to output/requirements contracts are required to exercise good faith in determining outputs or requirements, as well as accept the concomitant risk that their counterparts to the contract may make good faith variations . . .")(citations omitted).  When an output or requirements contract contains a stated estimate, many courts hold that, consistent with Section 2-306 of the Uniform Commercial Code, any good faith increases or decreases from estimated quantities under a requirements contract are permissible.  *See, e.g., Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333 (7th Cir. 1988); *Brewster of Lynchburg, Inc. v. Dial Corp.,* 33 F.3d 355, 364 (4th Cir. 1994)(recognizing that, so long as the buyer does so in good faith, the buyer "may reduce its requirements to any amount, including zero")(citations omitted); *Atlantic Track & Turnout Co. v. Perini Corp.,* 989 F.2d 541 (1st Cir. 1993).  Some courts hold that unreasonably disproportionate good faith decreases, but not unreasonably disproportionate increases from estimated quantities under a requirements contract are permissible. *See, Simcala, Inc. v. American Coal Trade, Inc.,* 821 So.2d 197, 202-203 (Ala. 2001)(surveying the case law).

-22-

Supply Agreement.  Both Western Wood and Pellets Products knew that Pellet Products would require some time to start up its manufacturing process and become productive.  At the time the parties entered into the Second Supply Agreement, Western Wood knew that Pellet Products was continuing to have numerous problems that adversely affected production, including inadequate funds to properly maintain its the equipment and to buy critical replacement parts.   Even after more than a year of operations, Pellet Products still had not come close to the production levels initially anticipated in 2007, though Pellet Products continued to improve its process and increase production over time.

The evidence indicates that Pellet Products' equipment has the capacity to produce 640 tons of pellets per month, but that Pellet Products has never achieved a 640 tons-per-month production level.  Reports from November 2011 through January 2012 reflect that Pellet Products produced between 293 and 438 tons per month, resulting in payments due to Western Wood of $3,390.00 for 293 tons produced and $8,343 for 438 tons produced.  *See* Exhibit 23.  In contrast, Western Wood expected the Second Supply Agreement to generate $30,000 per month.

Western Wood's *expectations* with respect to the quantity of wood by-product material Pellet Products would purchase under the Second Supply Agreement do not establish the quantity Pellet Products was *required* to purchase under the Second Supply Agreement. But based on the language in the Second Supply Agreement, the parties' course of dealings with respect to the First Supply Agreement as it relates to the formation of the Second Supply Agreement, and the parties' course of performance with respect to the Second Supply Agreement, the Court can determine the required quantity as agreed between the parties.

During the term of the First Supply Agreement, Western Wood was continually frustrated because it had by-product material to sell well in excess of Pellet Products' requirements.

-23-

Western Wood could not commit to sell the excess by-product material under a long term supply agreement with another party because of its commitment to supply the wood by-product to Pellet Products. Pellet Products was fine with Wood Products selling by-product material to others but only so long as Pellet Products' requirements were met. These dual concerns led to the inclusion of a new provision in the Second Supply Agreement. The Second Supply Agreement added the following language not contained in the First Supply Agreement:

> Western Wood Products reserves the right to sell any materials deemed unusable or agreed upon overstock by Western Pellet Products plant manager.
> Exhibit 3, ¶ 1.

This provision qualified the output term in the Second Supply Agreement by permitting Western Wood to sell its output of by-product material in excess of Pellet Products' requirements, the "overstock", to third parties.

The Second Supply Agreement also contains the following provision:

> In the event the Producer is unable to obtain an adequate volume of waste material from the Supplier then the Producer may request the Supplier to obtain additional material at a price and volume agreeable in writing by both parties. Not to exceed 10% of suppliers costs considering moisture and fuel. Any variation of this agreement will require a written authorization form both parties.
> Exhibit 3, ¶ 1.

The parties have a duty to each other to act in good faith with respect to each party's performance and enforcement of the Second Supply Agreement. *See* N.M.S.A. 1978 § 55-1-304 (Cum. Supp. 2009)("Every contract or duty within this act [this chapter] imposes an obligation of good faith in its performance or enforcement."). Based on the mutual good faith requirement, the express language of the Second Supply Agreement regarding quantity terms, and the parties' course of dealing that led up to the execution of the Second Supply Agreement, the Court finds that Western Wood has the right to require Pellet Products to either commit to purchase a certain amount of by-product material or consent to Western Wood's sale of its wood by-product

-24-

material in excess of the quantity Pellet Products will commit to purchase to the extent necessary for Western Wood to sell the excess (the overstock) in a commercially reasonable manner.  The Second Supply Agreement requires Western Wood to initiate conversations with Pellet Products' plant manager to obtain his consent to allow Western Wood to sell the overstock after making good faith disclosure of its ability to actually sell the overstock to others and on what terms, including the proposed duration of any contract.  Pellet Products' plant manager is required to give such consent in good faith consistent with the good faith realistic foreseeable quantity requirements of Pellet Products, taking into account the needs of Western Wood to sell the overstock to others in a commercially reasonable manner under supply agreements for reasonable durations.  If it turns out that Pellet Products' requirements are greater than the material Western Wood has available to supply it due to Western Wood's commitments to other customers, then the Second Supply Agreement allows Pellet Products to request Western Wood to obtain additional material at a price and volume agreeable in writing by both parties, not to exceed 10% of Western Wood's costs of obtaining such material considering moisture and fuel.  If such a request is made, Western Wood has the obligation to use good faith efforts to obtain such material at a reasonable cost.

However, based on Pellet Products' historical production levels, the parties' course of performance, and the express terms of the Second Supply Agreement, Western Wood cannot declare a default based on Pellet Products' failure to purchase *all* of the wood by-product material that Western Wood produced.  There is no evidence that Western Wood requested Pellet Products' plant manager to agree to Western Wood's sale of overstock as provided in the Agreement and as described above.  Because Western Wood has not attempted to avail itself of this additional provision, it cannot establish that Pellet Products wrongfully withheld its consent

to Western Pellet's sale of the "agreed upon overstock." The Court, therefore, finds that Pellet Products is not in default of the quantity requirements under the Second Supply Agreement.

> _Payment Terms:_ 3) failure to pay for by-product material in billed and unbilled amounts; and
> 4) failure to timely pay for wood by-product material

The Second Supply Agreement does not include a due date for payments. To determine a payment due date, the Court may look to the parties' course of performance.[18] Further, under general contract law, "when an agreement does not specify a time for performance, it is implied that it is to be performed within a reasonable time, and what is a reasonable time is a question of fact." _Beaver v. Brumlow_, 148 N.M. 172, 180, 231 P.3d 628, 636 (Ct. App. 2010)(citation omitted).[19] The Court may also imply a payment due date based on usage of trade, which requires factual proof of "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." N.M.S.A. 1978 § 55-1-303(d)(2009 Cum. Supp.).

The parties' course of performance indicates that Pellet Products would tally the total weight of its finished product and compute the amount it owed to Western Wood on a monthly basis. Pellet Products historically paid those amounts within 60 to 90 days, but on some occasions paid Western Wood more than 90 days after the end of the month. Western Wood consistently complained about the payment, but accepted all payments it received from Pellet Products under the Second Supply Agreement. Pellet Products paid 60 to 90 days after month end, not because of an agreement of the parties, but because of its financial difficulties. Mr.

---

[18] _See J.R.Hale Contracting Co., Inc. v. United New Mexico Bank at Albuquerque,_ 110 N.M. 712, 718, 799 P.2d 581, 587 (1990)("the UCC recognizes that the conduct of the parties in _performing_ an agreement may be relevant to show a modification or waiver of a provision inconsistent with their conduct in the performance of that agreement.")(emphasis in original). The Court may also look to the common law. _See_ N.M.S.A. 1978 § 55-1-103(b)(2009 Cum. Supp.)("Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity . . . supplement its provisions.").
[19] _See also Smith v. Galio,_ 95 N.M. 4, 7, 617 P.2d 1325, 1328 (Ct.App. 1980)("Where a contract is silent as to the time of performance, the law implies that it is to be performed within a reasonable time.")(citations omitted).

Levengood testified that a 15-day payment due date following month end wood meet his expectations.  This evidence fails to establish an agreed upon payment due date under the Second Supply Agreement.

The only evidence presented to the Court of a usage of trade respecting a payment due-date was Mr. Walton's testimony that a payment term of 45 days following month end would be consistent with industry standards.  However, there is no evidence before the Court that Mr. Walton has personal knowledge of industry standards in the area of pellet production.  His first experience in this industry was his employment as manager of Pellet Products.   Under the UCC, evidence regarding usage of trade can only be admitted when the other party has been given sufficient notice that such evidence will be presented. *See* N.M.S.A. 1978 § 55-1-303(g)(2009 Cum. Supp.)("Evidence of a relevant usage of trade offered by one party is not admissible unless that party has given the other party notice that the court finds sufficient to prevent unfair surprise to the other party.").  The Court will not, therefore, imply a payment due date based on such evidence of usage of trade.  In sum, because there is insufficient evidence of the industry standard or other evidence before the Court to serve as the basis for fixing a reasonable time for payment, the Court cannot imply a payment due date absent additional evidence.[20]

Certain amounts remain outstanding under the Second Supply Agreement.  As of January 9, 2012, the date Western Wood filed its bankruptcy petition, Western Wood's records reflected a balance of approximately $14,000 remained due from Pellet Products. *See* Exhibit 21 (reflecting balance of $14,323.00 on 12/16/11 and a balance of $8,883.00 on January 12, 2012).  Post-petition, Pellet Products paid Western Wood approximately $18,000. *Id.* (reflecting Credits of $10,791.00 and $8,193.00 on April 9, 2012).  The parties continued to operate under the

---

[20]In the event Western Wood decides to assume the Second Supply Agreement rather than reject it, the Court will consider additional evidence from which the Court can imply a payment due date term.

Second Supply Agreement for a period of time after the filing of the bankruptcy case. Pellet Products ceased production in mid-April 2012 as a result of Western Wood's refusal to supply Pellet Products with any additional wood-by-product material. At the time Pellet Products ceased operations, approximately $27,000.00 remained due to Western Wood. *Id.* (reflecting a balance as of April 30, 2012 of $27,165.00). Given that the outstanding balance as of the petition date was approximately $14,000, and Pellet Products paid Western Wood approximately $18,000.00 after the filing of the bankruptcy, the Court infers that the outstanding balance due Western Wood under the Second Supply Agreement resulted primarily from production that occurred from January to April 2012.

Based the parties' course of performance the Court finds that Western Wood waived by estoppel its right to declare a default under the Second Supply Agreement when it did based on the amounts that remain due under the Supply Agreement.[21] It appears that the majority of the outstanding amounts due Western Wood under the Second Supply Agreement are attributable to production of pellets that occurred within 90 days of the date Western Wood refused to supply Pellet Products wood by-product material. The parties' course of performance demonstrates that Western Wood consistently acquiesced in accepting payments from Pellet Products 60 to 90 days after its end-of-month calculation of the amounts due, and sometimes longer. Western Wood

---

[21] "To establish waiver by estoppel, the party asserting the doctrine must show that (1) the party to be estopped made a misleading representation by conduct; (2) the party claiming estoppel had an honest and reasonable belief based on that conduct that the party to be estopped would not assert a certain right under the contract or a defense thereto; and (3) the party claiming estoppel acted in reliance on the conduct to its detriment or prejudice." *THI of New Mexico at Hobbs Center, LLC v. Patton*, 2012 WL 112216, *10 (D.N.M. Jan. 3, 2012), *aff'd*, __ Fed.Appx. __, 2012 WL 5992259 (10th Cir. Dec. 3, 2012)(citation omitted). *See also Brown v. Taylor*, 120 N.M. 302, 305, 901 P.2d 720, 723 (1995)("'To prove waiver by estoppel the party need only show that he was misled to his prejudice by the conduct of the other party into the honest and reasonable belief that such waiver was intended.'")(quoting *J.R. Hale*, 110 N.M. at 717, 799 P.2d at 586). *Accord Cafeteria Operators, L.P. v. Coronado-Santa Fe Associates, L.P.*, 124 N.M. 440, 952 P.2d 435, 440 (Ct. App. 1997). Waiver by estoppel applies under the Uniform Commercial Code. *Cf. Premix-Marbletite Mfg. Corp. v. SKW Chemicals, Inc.*, 145 F.Supp.2d 1348, 1356 (S.D.Fla. 2001)(interpreting Florida's UCC, stating that the parties' course of performance "may become part of an agreement, via a type of estoppel, when one party fails to object to the manner with which the other party performs under the agreement.").

thereby waived the right to enforce compliance with a payment due date shorter than the 60 – 90-day historical payment dates.

UCC § 2-209(5) addresses the right of a party who has made a waiver to retract the waiver. It provides:

> A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived, unless the retraction would be unjust in view of a material change of position in reliance on the waiver.

N.M.S.A. 1978 55-2-209(5) (1993 Repl. Pamp.).

Western Wood never gave Pellet Products notice that if Pellet Products failed to make payments under the Second Supply Agreement within a certain time Western Wood would declare a default under the Second Supply Agreement. Western Wood thus has not retracted the waiver. Unless and until it retracts the waiver as to future payments, Western Wood may not declare that late payments constitute a breach of the Second Supply Agreement.

*"Pay-weight" Measurement:*          *5) failure to weigh the wood by-product material removed from Western Wood's property for use in the pellet mill*

The Second Supply Agreement requires Pellet Products to purchase wood by-product materials from Western Wood "at a rate of thirty dollars per dry ton." *See* Second Supply Agreement, ¶ 2. The Second Supply Agreement provides further that "$30.00 per dry ton is the rate established for Bi-Products generated by the manufacturing of post and pole material." *Id.* The parties' course of performance establishes that $30.00 per dry ton is the price for wood by-product material to be purchased by Pellet Products under the Second Supply Agreement regardless of whether the material is generated by the manufacturing of post and pole material or other sawmill operations.

The parties' course of performance indicates that Pellet Products agreed to pay Western Wood for the wood by-product material in the finished product based on the weight of the finished product. Over the life of the First Supply Agreement and the Second Supply Agreement, Mr. Levengood expressed concerns about the additional wood by-product material Pellet Products used to fuel its dryers as well as waste that occurred during the pellet-manufacturing process. Pellet Products appears to agree that the Second Supply Agreement requires it to pay for all of the wood by-product material it uses. Yet, Pellet Products has not paid for by-product material burned as fuel or wasted in its manufacturing process because the parties could not reach agreement on how to measure the dry tons of material used for those purposes.

It may be possible to resort to industry or trade usage to supply such an additional term in the Supply Agreement. *See* N.M.S.A. 1978 § 55-2-202(a)(2009 Cum. Supp.)(agreement may be supplemented with evidence of usage of trade); N.M.S.A. 1978 §55-1-303(c) and (e)(2009 Cum. Supp.)(defining usage of trade and providing that usage of trade must be construed consistent with the express terms of the agreement). It also may be possible to establish a method to measure by-product material used for fuel and lost as waste in the manufacturing process by scientific evidence. But the evidence now before the Court is insufficient to supply that term.[22]

By accepting payment based on the weight of Pellet Products' finished product, Western Woods has waived by estoppel its right to assert that Pellet Products breached the Second Supply Agreement by failing to pay for the wood by-product material used to fuel its dryers and lost as waste as part of its manufacturing process. The parties' course of performance establishes that Western Wood continued to accept payment under the Second Supply Agreement based on a dry

---

[22]In the event Western Wood decides to assume the Second Supply Agreement rather than reject it, the Court will consider additional evidence from which the Court can imply a surcharge term to account for the additional wood by-product material used for fuel and lost to waste in the manufacturing process.

ton of finished product. Consequently Pellet Products' failure to pay for wood by-product material used for fuel and lost to waste in the manufacturing process does not constitute a default under the Second Supply Agreement. As this point, a retraction of the Western Wood's waiver must be prospective only due to the nature of Pellet Products' detrimental reliance on the waiver.

_Miscellaneous:_ *6) removal of material without permission from Western Wood*

In addition, the evidence does not support a finding that Pellet Products impermissibly removed material from Western Wood's property. Until Western Wood finally refused to supply its wood by-product material to Pellet Products, the parties' course of performance under the Second Supply Agreement indicates that Pellet Products routinely obtained the wood by-product material from Western Wood's property with it permission. After Western Wood's final refusal to supply its wood by-product material to Pellet Products, Western Wood's representative testified that he never saw anyone from Pellet Products come on to Western Wood's property and remove by-product material.

B.    *The Lease*

Western Wood alleges that Pellet Products has defaulted under the Lease based on Pellet Products' failure to timely pay the 2012 rent, failure to insure the pellet mill, failure to perform under the Second Supply Agreement, and failure to obtain an air quality permit. The Court has already determined that Pellet Products did not breach the Second Supply Agreement. For the reasons stated below, the Court finds that Pellet Products has not defaulted under the Lease.

Under New Mexico law, "waivers may be implied by a course of conduct which, in turn, will estop the one who waives from asserting the right waived." *Easterling v. Peterson,* 107 N.M. 123, 124, 753 P.2d 902, 903 (1988)(citations omitted). A waiver is generally defined as an intentional relinquishment of a known right. *See Brannock v. Brannock,* 104 N.M. 385, 385,

-31-

722 P.2d 636, 636 (1986)(defining waiver as "'the intentional abandonment or relinquishment of a known right.'")(quoting *Brown v. Jimerson,* 95 N.M. 191, 192, 619 P.2d 1235, 1236 (1980)). Where one party to a contract has by his own conduct consistently failed to demand strict compliance with the terms of the contract, such as by accepting late payments, such party must give adequate notice to the other party of the intent to insist upon strict compliance in order to overcome a waiver by conduct and declare a default. *Easterling,* 107 N.M. at 124, 753 P.2d at 905 (citing *Fisher v. Tiffin,* 275 Or. 437, 551 P.2d 1061 (1976) and *Dillingham Commercial Co. v. Spears,* 641 P.2d 1 (Alaska 1982)(remaining citation omitted)).[23]

Here, the rental payment under the Lease is the nominal amount of $100 per year due February 1. Mr. Levengood could not recall whether Pellet Products paid the rent for the years 2008 through 2010. He testified that he was focused at that time on getting the plant up and running, and because the amount is such a small sum, he might not have realized if it had not been paid. For 2012, Pellet Products tendered the rent on January 31, 2012, though Western Wood's record of all transactions with Pellet Products does not reflect this payment. *See* Exhibit V (General Ledger for Pellet Products reflecting $100.00 payment dated January 31, 2012 for "Lease Agreement between WWP and WPP"); Exhibit W. Mr. Levengood acknowledged that the 2012 rent "was delivered at some time."

The Lease includes a requirement that Pellet Products, as tenant, "shall not use the premises during the term hereof for any purpose contrary to the laws of the State of New Mexico or the United States." *See* Exhibit C. The Lease does not include a specific term requiring Pellet Products to obtain an air quality permit or exemption for air quality permit. Mr. Levengood

---

[23] *Cf. Westinghouse Credit Corp. v. Shelton,* 645 F.2d 869, 873 (10th Cir. 1981)(construing a retail installment contract for a mobile home under the Oklahoma UCC, and observing that "courts have uniformly held that a creditor may not fall into a pattern of accepting delinquent installments and then suddenly declare default, without first apprising the debtor of his insistence on strict compliance with the terms of the contract.")(citations omitted).

testified that Western Wood holds an air quality permit exemption. Mr. Pillmore testified that Pellet Products does not have an air quality permit or exemption, but that based on conversations with Mr. Levengood, he thought that Pellet Products may not need to obtain an air quality permit. Mr. Pillmore further testified that one of Pellet Products' investors had done some investigation to determine whether Pellet Products needed an air quality permit, but Mr. Pillmore did not know the outcome of that investigation.

Until Western Wood hired an attorney who sent the Letter to Pellet Products alleging defaults under the Lease, Western Wood had not given Pellet Products any indication that it believed Pellet Products was in default under the terms of the Lease. The Letter asserted, among other things, that Pellet Products failed to maintain insurance contrary to the terms of the Lease. *See* Exhibit 36. Upon receipt of the Letter, Pellet Products provided Western Wood proof of insurance. The Letter was later retracted. *See* Exhibit T.

Under these circumstances, the Court concludes that Pellet Products has not defaulted under the Lease. Over the life of the Lease, Western Wood was not particularly concerned with timely receipt of rental payments. Thus, even if Pellet Products' payment of the 2012 rent was untimely (and the evidence indicates it may have, in fact, been tendered in a timely fashion), the untimeliness of the nominal rental payment for 2012 is insufficient to constitute a present default under the Lease. The Letter, which indicated that Western Wood was intending to strictly enforce the terms of the Lease, was later retracted. *See* Exhibit 36 and Exhibit T. The evidence indicates that Pellet Products has insured the leased premises and that the insurance policy names Western Wood as an additional insured. The evidence presented regarding the need for Pellet

-33-

Products to obtain an air quality permit was inconclusive, and, therefore, insufficient to form the basis of a default.[24]

Even if Pellet Products is required to obtain an air quality permit, to retract its waiver of enforcement of the Lease term requiring Pellet Products not to use the leased premises "for any purpose contrary to the laws of the State of New Mexico," Western Wood must give Pellet Products reasonable notification of its intent to enforce strict compliance with any requirement to obtain an air quality permit or exemption from the State of New Mexico.[25] What is reasonable will depend on the time it reasonably would take Pellet Products to come into compliance.

C. *Damages*

By withholding wood by-product material from Pellet Products and refusing to allow Pellet Products to take any more wood by-product material from the piles of material located on Western Wood's sawmill property, Western Wood breached the Second Supply Agreement. A purchaser of goods under a contract governed by the UCC may be entitled to recover consequential damages resulting from the seller's breach. See N.M.S.A. 1978 §§ 55-2-714(3) and 55-2-715(2) (1993 Repl. Pamp.).[26] "Consequential damages are compensation for harm to the buyer as a consequence of not having the seller's promised performance . . . . and may encompass harm to . . . property of the buyer other than the goods." *The ABCs of the UCC (Revised) Article 2: Sales,* at 156.

---

[24]In the Pre-Trial Order Western Wood also requested the Court to determine which fixtures built by Pellet Products on the leased premises are part of the real estate. The Lease itself addresses this question. It provides: "All fixtures built by the tenant except the buildings, shall not merge with the real estate, but shall remain the property of tenant." Exhibit C. Under the plain language of this provision, only the buildings become part of the real estate. Western Wood provided no other evidence at trial regarding this issue.

[25]*Cf.* N.M.S.A. 1978 § 55-2-209(5)(1993 Repl. Pamp.)(requiring a party who has waived an executory portion of a contract governed by the UCC to give "reasonable notification [to the other party] . . . that strict performance will be required of any term waived").

[26] The Second Supply Agreement contains no limitation or exclusion of consequential damages, even though such limitation s and exclusions generally are permitted under Article 2 of the UCC. See § 55-2-719(3).

-34-

Consequential damages recoverable under the UCC consist of "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not have been prevented by cover or otherwise." N.M.S.A. 1978 § 55-1-715(2)(a)(1993 Repl. Pamp.). Consequential damages should be allowed if (i) the damages were reasonably foreseeable by the seller[27]; (ii) the damages are not reasonably avoidable by cover or otherwise;[28] and (iii) the amount of loss may be determined in any manner which is reasonable under the circumstances.[29]

(i)  Foreseeability

Pellet Products' location right next to Western Wood's sawmill was the primary reason for starting up its wood pellet business since it ensured easy access to the material it needed to manufacture its products. Mr. Pillmore testified that it would be cost-prohibitive to purchase wood by-product material from some other source because of the delivery costs. Western Wood had reason to know both when the Second Supply Agreement was made and when it stopped deliveries that by refusing to supply wood by-product material to Pellet Products it would cause Pellet Products to shut down its business operations and Pellet Products would lose the value of its business and assets as a going concern.

(ii)  Avoidability

It would be cost-prohibitive for Pellet Products to purchase wood by-product material from some other source than Western Wood because of the delivery costs. As a result Pellet Products cannot avoid suffering consequential by any reasonable purchase of or contract to purchase

---

[27]See N.M.S.A. 1978 § 55-1-715(2)(a)(1993 Repl. Pamp.)regarding foreseeability of loss requirement ). See also, Sunnyland Farms, Inc. v. Central New Mexico Elec. Coop., Inc., 149 N.M. 746, 755-756, 255 P.3d 324, 333-334 (Ct. App. 2011)(regarding foreseeability of damages).
[28] "Cover" is defined as the buyer "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller." N.M.S.A. 1978 § 55-1-712(1)(1993 Repl. Pamp.).
[29]See N.M.S.A. 1978 § 55-1-715 (1993 Repl. Pamp.)(Official Comment 4 regarding proof of loss).

-35-

wood by-product material in substitution for those due from the Western Wood under the Second Supply Agreement.

(iii)     Proof of Loss

In general, the measure of a party's compensatory damages is the loss the party has suffered as a result of the other party's breach.  *Central Sec. and Alarm Co. v. Mehler,* 121 N.M. 840, 846, 918 P.2d 1340, 1346 (Ct.App. 1996)("The purpose of compensatory damages is to make the injured party whole by compensating it for losses.")(citation omitted); *Fredenburgh v. Allied Van Lines, Inc.,* 79 N.M. 593, 596, 446 P.2d 868, 871 (1968)("The measure of damages should be that which fully and fairly compensates for the injuries received.")(citations omitted).

At the time that Western Wood refused to supply Pellet Products with wood by-product material, Pellet Products could not operate its large pellet mill because the large bearing had failed.  Had Western Wood not breached the Second Supply Agreement, Pellet Products would have continued to manufacture pellets on its smaller pellet mill on the leased property, and on its larger pellet mill upon repair of the bearing.

The evidence presented at trial established that the value of Pellet Products' equipment installed in its pellet mills is $800,000 if sold as part of an operating pellet manufacturing facility, but that, if the equipment is removed, the value is $400,000.  Mr. Pillmore testified that Pellet Products received an offer to purchase its pellet manufacturing business for $4 million, but no other evidence was offered to support his testimony.  There is no evidence that the offer was a bona fide offer made by a purchaser financially capable of closing, or of any of the other terms or conditions of the offer.  Pellet Products proffered no other evidence of the value of its business. Consequently, the Court finds that there is insufficient evidence to support Pellet Products' position that its business is worth $4 million as a going concern.  Pellet Products can

remove its equipment from the leased premises, but the equipment will lose half of its value. Thus, the Court fixes the appropriate damages if the Supply Agreement and Lease are rejected at $400,000.

      (iv)    <u>Allowed Non-Priority Unsecured Claim Upon Contract Rejection</u>

In the event the Court approves Western Wood's request to reject the Second Supply Agreement and the Lease, Pellet Products would hold a non-priority unsecured claim against the bankruptcy estate in the amount of $400,000. *See* 11 U.S.C. 365(g)(rejection of an executory contract constitutes a breach); *In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 25 (Bankr.D.Kan. 2001)("A debtor's rejection of an unexpired lease or executory contract constitutes a breach under § 365(g), which gives rise to a 'claim' for damages in favor of the non-debtor party. This 'claim created by the rejection is afforded treatment similar to other unsecured claims.")(citing *In re National Gypsum Co.,* 208 F.3d 498, 507 (5th Cir. 2000)). *See also In re American HomePatient, Inc.,* 414 F.3d 614, 620 (6th Cir. 2005)(rejection damages are generally determined under applicable state law).

D.    *The Automatic Stay*

Western Wood included in the Pre-Trial Order a claim for violation of the automatic stay under 11 U.S.C. §362(a)(3). Section 362(a)(3) prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).[30] Western Wood requests the Court to award a sanction based on Pellet Products' continued post-petition removal of wood by-product material from Western Wood. The Court declines to do so. There is no evidence that Pellet Products violated the

---

[30]A willful violation of the automatic stay occurs when a party knows that the automatic stay is in effect and takes an intentional action that violates the stay. *See, Johnson v. Smith (In re Johnson),* 501 F.3d 1163, 1172 (10th Cir. 2007)(to establish a willful violation of the automatic stay, the debtor must demonstrate "that the creditor knew of the automatic stay and intended the actions that constituted the violation; no specific intent is required.")(citations omitted).

automatic stay. To the contrary, the evidence establishes that, post-petition, representatives of Western Wood alternatively told representatives of Pellet Products that Pellet Products could remove, or could not remove wood by-product material from the piles located on Western Wood's property. There is no evidence that Pellet Products took any by-product material after Western Wood stopped supplying Pellet Products with the material.

E.    *Rejection of the Second Supply Agreement and the Lease*

Western Wood seeks to reject the Second Supply Agreement and the Lease under 11 U.S.C. § 365(a). Under this section, a debtor in possession may assume or reject an unexpired lease or executory contract, subject to approval by the bankruptcy court. *Id.* Section 365 allows "a debtor to reject executory contracts in order to relieve the estate of burdensome obligations[.]" *In re Penn Traffic Co.,* 524 F.3d 373, 382 (2nd Cir. 2008)(quoting *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)* 10 F.3d 944, 954-55 (2nd Cir. 1993)(additional citation and internal quotation marks omitted)). The "business judgment" standard is the appropriate standard for determining whether a debtor in possession's decision to reject an unexpired lease or executory contract should be approved.[31] In applying this standard, the Court acts as an "overseer of the wisdom with which the bankruptcy estate's property is being managed by the trustee or debtor-in-possession, and not, as it does in other circumstances, as the arbiter of disputes between creditors and the estate." *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1099 (2nd Cir. 1993). Deference is given to the debtor in

---

[31]*See In re Pomona Valley Medical Group, Inc.,* 476 F.3d 665, 670 (9th Cir. 2007)(in evaluating a debtor in possession's decision to reject an executory contract, the court "'applies the business judgment rule'")(quoting *Durkin v. Benador Corp. (In re G.I. Indust., Inc.),* 204 F.3d 1276, 1282 (9th Cir. 2000)(remaining citations omitted); *Valley View,* 260 B.R. at 39. *See also, In re Tilco, Inc.,* 558 F.2d 1369, 1373 (10th Cir. 1977)(applying former Bankruptcy Act, and finding that the court must exercise its business judgment to assess whether the debtor in possession should reject/assume).

possession's decision to reject an executory contract or unexpired lease.[32]  The impact that
rejection of an executory contract or unexpired lease may have on the estate and a debtor in
possession's prospect of confirming a plan, including the effect of the resulting rejection
damages claim, is relevant to the determination of whether the Court should approve rejection.[33]
Generally, the Court should not interfere with the debtor in possession's exercise of business
judgment to reject a lease or executory contract unless the decision is "so manifestly
unreasonable that it could not be based on sound business judgment[.]"  *Lubrizol,* 756 F.2d at
1047.[34]

       Western Wood seeks to reject both the Second Supply Agreement and the Lease.  Under
the business judgment standard, the Court must give some deference to Western Wood's
decision.  However, Western Wood proposed to reject the Second Supply Agreement and the
Lease based on its belief that Pellet Products had breached the Second Supply Agreement and
had defaulted under the Lease.  The Court has now determined the opposite:  Pellet Products has
not breached the Second Supply Agreement and has not defaulted under the Lease.  In order to
evaluate Western Wood's decision to reject, the Court needs additional evidence from Western
Wood regarding its business judgment that takes into account the Court's determination that

---

[32]*See Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043, 1046 (4th Cir. 1985)("the
bankrupt's decision . . . is to be accorded the deference mandated by the sound business judgment rule").
[33]*See Valley View,* 260 B.R. at 39 (stating that the determination of whether to approve a motion to assume an
executor contract or unexpired lease "must include a consideration of the effects that assumption would have on the
debtor; the implications for the lessor; the benefit or detriment to unsecured creditors; and the significance of the
lease to the debtor's reorganization.")(citation omitted); *In re Chira,* 367 B.R. 888, 898 (S.D.Fla. 2007)(finding that
the bankruptcy court appropriately considered the potential rejection claim and consequential damages in applying
the business judgment test to evaluate (and ultimately approve) a request to assume an executory contract). *See also,
Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. IML Freight, Inc.,* 789 F.2d 1460,
1462 and 1463 (10th Cir. 1986)(observing that "the controlling question is whether the hardships imposed [by
rejection of the executory contract] are outweighed by a reasonable expectation of successful reorganization[]" and
recognizing that "the rejections could generate burdensome claims against the estate")
[34]*See also Pomona Valley,* 476 F.3d at 670 (stating that the court should approve a debtor in possession's rejection
of an executor contract "unless it fines that the debtor-in-possession's conclusion that rejection would be
'advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad
faith, or whim or caprice.'")(quoting *Lubrizol,* 756 F.2d at 1047).

Pellet Products has not breached the Second Supply Agreement and has not defaulted under the Lease and the amount of the allowed claim Pellet Products will hold if rejection occurs. The Court will, therefore, schedule a continued hearing on Western Wood's Motion to Reject if Western Wood still wishes to reject the Supply Agreement and Lease. A separate judgment consistent with the Court's Memorandum Opinion will be entered.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: April 4, 2013

COPY TO:

**William F. Davis**
Attorney for Western Wood Products, Inc.
6709 Academy NE, Suite A
Albuquerque, NM 87109

**William R. Keleher**
**Spencer Lewis Edelman**
Attorneys for Western Pellet Products, LLC
PO Box 2168
Albuquerque, NM 87103-2168